## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SCOTT SWAIN, *et al.* | |
| Plaintiffs, | |
| v. | No. 1:17-cv-00071-RGA |
| WILMINGTON TRUST, N.A. as successor to Wilmington Trust Retirement and Institutional Services Company, | |
| Defendant. | |

## DEFENDANT WILMINGTON TRUST N.A.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION <u>AND FOR FAILURE TO STATE A CLAIM</u>

Dated: April 3, 2017

OF COUNSEL:

GROOM LAW GROUP, CHARTERED

Michael J. Prame (*pro hac vice*)
Lars C. Golumbic (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
Andrew D. Salek-Raham (*pro hac vice*)
1701 Pennsylvania Ave., N.W., Suite 1200
Washington, D.C. 20006
Telephone:  (202) 857-0620
mprame@groom.com
lgolumbic@groom.com
nfedder@groom.com
asalek-raham@groom.com

MORRIS JAMES LLP

Clark Collins (#739)
Albert Manwaring (#4339)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 888-6868
pcollins@morrisjames.com
amanwaring@morrisjames.com

*Attorneys for Defendant Wilmington Trust, N.A.*

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS .......................................................................... 1

II.   SUMMARY OF THE ARGUMENT ................................................................................... 1

III.  STATEMENT OF FACTS .................................................................................................. 2

      A. Legal Background ...................................................................................................... 2

      B. The ISCO ESOP ........................................................................................................ 4

      C. Post-Transaction Events ............................................................................................ 6

IV.   APPLICABLE STANDARDS OF REVIEW ...................................................................... 7

      A. Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction ...................... 7

      B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim ......................................... 8

V.    ARGUMENT ................................................................................................................... 8

      A. The Court Lacks Subject Matter Jurisdiction ................................................................. 8

          1. Article III Requirements ............................................................................................ 9

          2. Plaintiffs Have Not Suffered an Injury to Their Personal Legal Interests ............... 10

          3. Plaintiffs Have Not Alleged a Real and Immediate Threat of Future Injury ........... 13

      B. Plaintiffs' Have Failed to State a Plausible Prohibited Transaction Violation ............... 15

VI.   CONCLUSION ................................................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 2, 15, 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 2, 8, 15

*Brown v. Medtronic*, 628 F.3d 451 (8th Cir. 2010) ..................................................... 10

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................... 14

*Dole v. Farnum*, Civil Action No. 90-0371 (D.R.I. July 30, 1990) ............................... 11

*Goldenberg v. Indel, Inc.*, 741 F.Supp.2d 618 (D.N.J. 2010) ...................................... 17

*Henry v. Champlain Enters., Inc.*, 288 F. Supp. 2d 202 (N.D.N.Y. 2003) .................... 3

*Henry v. Champlain Enters., Inc.*, 445 F.3d 610 (2d Cir. 2006) ........................... 2, 3, 4

*In re Wilmington Trust Corp. ERISA Litig.*, 943 F. Supp. 2d 478 (D. Del. 2013) .......... 9, 10

*Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818 (C.D. Ill. 2004) ........................... 2

*Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005) ................................... 2, 3, 4

*Loren v. Blue Cross Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007) ...................... 9

*Mehling v. New York Life Ins. Co.*, 163 F.Supp.2d 502 (E.D.Pa. 2001) ....................... 17

*Mercer Outdoor Advertising, LLC v. City of Hermitage, Penn.*, 605 Fed.Appx. 130 (3d Cir. 2015) ....................................................................................................... 8

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F2.d 884 (3d Cir. 1977) .................... 7

*Mosby v. Ligon*, 418 F.3d 927 (8th Cir. 2005) ............................................................ 14

*Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Gonzales*, 211 Fed.Appx. 91 (3d Cir. 2006) ................................................................................................. 9

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .................................................................. 14

*Perelman v. Perelman*, 919 F.Supp.2d 512 (E.D. Pa.), *aff'd* 793 F.3d 368 (3d Cir. 2015) ........... 9

*Phifer v. Sevenson Envtl. Servs., Inc.*, No. 11-169, 2012 WL 868692 (D. Del. Mar. 14, 2012) .... 8

i

*Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011) ...................................................................... 8

*Resnik v. Woertz*, 774 F.Supp.2d 614 (D.Del. 2011) ...................................................................... 7

*Solomon v. Ave. Const. LLC*, 2012 WL 23339260 (D. Del. June 19, 2012) ............................... 15

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ....................................................................... 9, 14

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181 (3d Cir. 2006) ............................................. 9

*Werner v. Primax Recoveries, Inc.*, 365 Fed. App'x 664 (6th Cir. 2010) ................................... 13

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ................................................... 14

**Statutes**

ERISA § 3(14)(A)-(I); 29 U.S.C. § 1002(14)(A)-(I) ...................................................................... 16

ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B) ........................................................................... 3, 17

ERISA § 3(34), 29 U.S.C. § 1002(34) ........................................................................................... 2

ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) ....................................................................... 2

ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E) ...................................................................... 15

ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) ................................................................................ 17

ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) ................................................................................ 18

ERISA § 407(b)(1), 29 U.S.C. §1107(b)(1) ................................................................................. 16

ERISA § 407(d)(6)(A), 29 U.S.C. § 1107(d)(6)(A) ....................................................................... 2

ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) ................................................................................ 18

ERISA § 408(e), 29 U.S.C. § 1108(e) ..................................................................................... 3, 17

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................................. 1, 7

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 1, 8, 15

Fed. R. Civ. P. 8(a) ..................................................................................................................... 18

**Other Authorities**

136 Cong. Rec. S17793, 1990 WL 168765 (October 27, 1990)................................................... 11

*About Us*, STOUT RISIUS ROSS, GLOBAL FINANCIAL ADVISORY SERVICES,
http://www.srr.com/about............................................................................................................ 5

I.R.S. IRM § 4.72.4.3.6, 2006 WL 5223497 (Apr. 1, 2006)........................................................ 11

Staff of the S. Comm. on Fin., 95th Cong., ESOPs and TRASOPs: An Explanation for
Employees 10 (Comm. Print 1978)........................................................................................... 2

## I.        NATURE AND STAGE OF PROCEEDINGS

Plaintiffs Scott Swain and Kenny Fiorito filed their Complaint ("Compl.") on January 25, 2017.  D.I. 1.  The parties stipulated to, and the Court approved, an extension until April 3, 2017 of the deadline for Wilmington Trust, N.A. ("Wilmington Trust") to respond to the Complaint.  D.I. 4.  The parties have not sought to alter any other deadlines and have yet to confer pursuant to Rule 26 of the Federal Rules of Civil Procedure.

## II.       SUMMARY OF THE ARGUMENT

This lawsuit relates to the ISCO Industries, Inc. Employee Stock Ownership Plan (the "ESOP") that ISCO Industries, Inc. ("ISCO" or "the Company") established at the end of 2012.  Plaintiffs are two former ISCO employees who allege that that they are participants in the ESOP.  Although the value of the company stock in their ESOP accounts has more than doubled in value since 2012, Plaintiffs theorize that Wilmington Trust, in its capacity as the independent discretionary trustee for the ESOP, caused the ESOP to pay too much for the company's stock.  Based on this theory, Plaintiffs allege that Wilmington Trust violated certain "prohibited transaction" rules under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Plaintiffs' Complaint should be dismissed for two reasons:

1.        The Complaint should be dismissed under Rule 12(b)(1), Fed.R.Civ.P.  Plaintiffs fail to allege any personal, individualized harm stemming from the events described in the Complaint.  In the absence of an individualized injury in fact, as required by Article III of the United States Constitution, the Court lacks subject matter jurisdiction.

2.        The Court should dismiss the Complaint under Rule 12(b)(6), Fed.R.Civ.P.  Plaintiffs' threadbare allegations and rote recitation of the legal elements for an ERISA

prohibited transaction claim do not satisfy the pleading requirements established in *Twombly* and *Iqbal*.

### III.     STATEMENT OF FACTS

#### A.     Legal Background

An employee stock ownership plan ("ESOP") is a type of defined contribution pension benefit plan that "invests primarily in the employer's stock." *Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818, 862 (C.D. Ill. 2004) (*citing* ERISA § 407(d)(6)(A), 29 U.S.C. § 1107(d)(6)(A)). ESOPs and other defined contribution plans are "individual account plans," meaning that the plan "provides . . . for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account." ERISA § 3(34), 29 U.S.C. § 1002(34).

Certain provisions of ERISA seek to avoid conflicts of interest in connection with a pension benefit plan's investment in employer securities. Specifically, subject to the "adequate consideration" exemption discussed below, ERISA § 406(a)(1)(A) prohibits a plan fiduciary from causing a pension benefit plan to enter into "certain categories of transactions believed to pose a high risk of fiduciary self-dealing," including transactions involving the acquisition of employer securities. *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (citing ERISA § 406(a)(1)(A), (E), 29 U.S.C. § 1106(a)(1)(A), (E)); *see Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005) (citing ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A)).

Since the passage of ERISA in 1974, Congress has consistently supported the creation of ESOPs. *See, e.g.*, Staff of the S. Comm. on Fin., 95th Cong., ESOPs and TRASOPs: An Explanation for Employees 10 (Comm. Print 1978), *available at* https://www.finance.senate.gov/imo/media/doc/sprt95-31.pdf ("[W]e should . . . give Americans the opportunity to become

2

owners of our growing frontier of new capital (stock).  The way to do this is through laws which encourage the development of programs like ESOP[s].").  Recognizing that ERISA's prohibited transaction rules would "significantly hamper the implementation of ESOPs, particularly by small companies," Congress created "a conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs and certain other plans."  *Henry*, 445 F.3d at 618 (citation omitted).  The exemption "permits the sale of employer stock by a party in interest to an ESOP if the purchase is made for '*adequate consideration*.'" *Id.* (citing ERISA § 408(e), 29 U.S.C. § 1108(e)) (emphasis added).  In the context of employer stock that is not publicly traded, "adequate consideration" is defined under ERISA as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]."  ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B)).

The fair market value and good faith inquiries are "closely intertwined," *Henry*, 445 F.3d at 619, and, as such, "[t]he degree to which a fiduciary makes *an independent inquiry* [into the stock's value] is critical."  *Keach*, 419 F.3d at 636 (citations omitted) (emphasis added).  Consequently, an independent discretionary trustee often is retained to represent the ESOP in any employer stock purchase transaction in order to remove any influence by the selling shareholders, the board of directors, or senior officials at the company.  *See Henry v. Champlain Enters., Inc.*, 288 F. Supp. 2d 202, 222 (N.D.N.Y. 2003) (noting that it "may reap incurable conflicts of interest and effectively paralyze the sale of stock to employees of closely held corporations" if "seller defendants . . . in their capacities as . . . directors, could be ESOP fiduciaries at the same time they sat across the table from the ESOP as sellers").

3

In turn, the independent discretionary trustee typically retains its own *independent*

valuation expert to advise it as to the stock's fair market value.  *See Henry*, 445 F.3d at 614

("[G]eneral requirements of an ESOP transaction" include hiring "a financial appraiser, and a

trustee to represent the ESOP."); *Keach*, 419 F.3d at 636-37 ("[S]ecuring an independent

assessment from a financial advisor or legal counsel is evidence of a thorough investigation[.]")

(citation omitted).  In doing so, the ESOP trustee "must 'investigate the expert's qualifications,'

'provide the expert with complete and accurate information' and 'make certain that reliance on

the expert's advice is reasonably justified under the circumstances.'"  *Keach*, 419 F.3d at 637

(citation omitted).  After conducting due diligence, if the trustee is satisfied that the sale of the

stock is for adequate consideration such that the transaction is exempt from ERISA's prohibited

transaction rules, the trustee approves the ESOP's purchase of the stock.

**B.**     **The ISCO ESOP**

ISCO was originally founded in 1962 by James Kirchdorfer, Sr. as a Kentucky-based

distributor of irrigation products.  Declaration of James S. Kirchdorfer, Jr. ("Kirchdorfer Decl.")

¶ 2; Compl. ¶ 35.  Over the years, ISCO has become a leading provider of high density

polyethylane ("HDPE") piping solutions and related services, including fabrication, fitting,

fusion equipment, and technical support.  Kirchdorfer Decl. ¶ 2; *see* Compl. ¶ 16.

In 2012, ISCO and its shareholders (the members of the Kirchdorfer family and family-

related trusts) hired an investment banking firm to explore strategic alternatives for the company.

Kirchdorfer Decl. ¶ 3.  As the company considered alternatives to a traditional sale, it also

explored the possibility of establishing an ESOP in order to provide a retirement plan for

employees in line with the company's core values.  *Id.*

In October 2012, ISCO entered into an agreement with Wilmington Trust whereby

4

Wilmington Trust was engaged to act as the independent discretionary trustee.  Kirchdorfer Decl.
¶ 4; Compl. ¶ 15. ("Wilmington Trust had exclusive authority to manage and control the assets
of the Plan and had sole and exclusive discretion to authorize the ESOP Transaction.").  As an
independent discretionary trustee, Wilmington Trust would represent the ESOP (which would be
formed concurrently with the proposed transaction) in connection with its proposed acquisition
of shares of company stock.  Compl. ¶ 15.  Wilmington Trust then engaged Stout Risius Ross,
Inc. ("SRR"), a global financial advisory services firm that specializes in, among other things,
the valuation of employer stock in connection with ESOP transactions.  *See generally About Us*,
STOUT RISIUS ROSS, GLOBAL FINANCIAL ADVISORY SERVICES, http://www.srr.com/about.

SRR valued the ISCO stock offered to the ESOP and provided an opinion that, *inter alia*,
the consideration the ESOP was paying for the company stock was not greater than fair market
value.  On December 20, 2012, following a period of due diligence and negotiation that included
SRR's issuance of its valuation report and opinion of fair market value of the shares being
offered for sale to the ESOP, Wilmington Trust approved the ESOP's acquisition of 4 million
newly-issued Class A shares of ISCO stock for $98 million (the "Transaction").  Compl. ¶ 5.

Like many ESOP transactions, the Transaction was debt financed.  *Id*.  The ESOP entered
into a loan agreement with ISCO, under which ISCO loaned the $98 million that the ESOP then
used to purchase 4 million shares of newly-issued Class A stock from ISCO.  Kirchdorfer Decl.,
Ex. B, December 20, 2012 ESOP Loan and Pledge Agreement ("ESOP Loan Agreement") at 1.

Concurrent with ISCO's sale of stock to the ESOP, the company redeemed the company
stock that had been formerly issued to the members of the Kirchdorfer family and family-related
trusts.  *Id*.  The redemption also was primarily debt financed, with the company both borrowing
funds from outside lenders and issuing notes to the selling shareholders. Some of the previous

shares also were exchanged for shares of newly-issued Class A stock and warrants.

In 2015, the U.S. Department of Labor ("Department"), the federal agency charged with enforcing ERISA, conducted a comprehensive investigation of the ESOP and of ISCO as Plan Administrator, which included an analysis of the Transaction.  Kirchdorfer Decl. ¶ 5.  During its inquiry, the Department deposed and subpoenaed documents from various parties involved in the Transaction, including certain service providers.  The Department issued a letter last year closing its investigation and, in doing so, did not find that the Transaction violated ERISA's prohibited transaction provisions.  *Id.*

## C.    Post-Transaction Events

Plaintiffs became participants in the ESOP when it was established on December 20, 2012. Kirchdorfer Decl., Ex. A, January 1, 2012 Plan Document ("Plan Document") §§ 2.2, 4.6(a).  The ESOP provides that, assuming participants meet certain eligibility requirements, the ESOP would allocate to the participants' individual accounts on December 31 of each year a certain number of the shares of ISCO stock that the ESOP had acquired in 2012.  *Id.*

As identified on their ESOP account statements, after the Transaction, Plaintiffs' individual ESOP accounts were allocated certain shares each year.  Plaintiffs' accounts had the following balances:

|  | Per share value | Allocated shares | Account balance |
|---|---|---|---|
| **Swain** | | | |
| *12/31/12* | $9.75 | 331.06 | $3,227.91 |
| *12/31/13* | $15.90 | 677.02 | $10,764.72 |
| *12/31/14* | $18.20 | 1,000.34 | $18,206.33 |
| *12/31/15* | $21.10 | 1,000.34 | $21,107.33 |
| **Fiorito** | | | |
| *12/31/12* | $9.75 | 368.41 | $3,592.04 |
| *12/31/13* | $15.90 | 791.05 | $12,577.79 |
| *12/31/14* | $18.20 | 1,136.19 | $20,678.81 |
| *12/31/15* | $21.10 | 1,492.66 | $31,495.27 |

Kirchdorfer Decl., Ex. C, ISCO ESOP Statements of Account for Kenny Fiorito 2012-2015

("Fiorito Account Statements"); Kirchdorfer Decl., Ex. D, ISCO ESOP Statements of Account

for Scott Swain 2012-2015 ("Swain Account Statements").  As shown above, the per share value

of ISCO stock in Plaintiffs' ESOP accounts has more than doubled since 2012.  Kirchdorfer

Decl., Ex. C, Fiorito Account Statements; Kirchdorfer Decl., Ex. D, Swain Account Statements.

Swain's and Fiorito's employment with ISCO ended in September 2015 and July 2016,

respectively.  *See* Kirchdorfer Decl., Ex. E, September 9, 2015 Severance and Release

Agreement for Scott Swain ("Swain Release"); Kirchdorfer Decl., Ex. F, July 20, 2016

Severance and Release Agreement for Kenny Fiorito ("Fiorito Release").  In connection with the

termination of employment, both Swain and Fiorito agreed to a severance package that included

a covenant not sue and also a release of claims.  Kirchdorfer Decl., Ex. E, Swain Release;

Kirchdorfer Decl., Ex. F, Fiorito Release.

## IV.   APPLICABLE STANDARDS OF REVIEW

### A.   Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

Rule 12(b)(1), Fed.R.Civ.P., permits challenges to the Court's subject matter jurisdiction.

"When a motion under Rule 12 is based on more than one ground, the court should consider the

12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter

jurisdiction, all other defenses and objections become moot."  *Resnik v. Woertz*, 774 F.Supp.2d

614, 627 (D.Del. 2011) (citation omitted).  When a 12(b)(1) challenge is factual—meaning it is

based on "the sufficiency of jurisdictional fact"—the court "need not confine its consideration to

the allegations of the complaint nor accept those allegations as true."  *Id.* (citing *Mortensen v.

First Fed. Sav. & Loan Ass'n*, 549 F2.d 884, 891 (3d Cir. 1977)).  It is a plaintiff's burden to

establish standing.  *Mercer Outdoor Advertising, LLC v. City of Hermitage, Penn.*, 605

Fed.Appx. 130, 131 (3d Cir. 2015).

**B.** **Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

Pursuant to Rule 12(b)(6), Fed.R.Civ.P., the Court must dismiss a complaint that "fail[s]

to state a claim upon which relief can be granted."  To survive a Rule 12(b)(6) motion to dismiss,

the complaint must contain more than just "labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (citation omitted).  Although the court must accept well-pleaded allegations in the

complaint as true, it must determine whether those allegations are "enough to raise a right to

relief above the speculative level."  *Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011)

(citation omitted).  When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a

claim, courts may "look to the allegations made in the complaint, the exhibits attached to the

complaint, and any documents whose authenticity no party questions and whose contents are

alleged in the complaint."  *Phifer v. Sevenson Envtl. Servs., Inc.*, No. 11-169, 2012 WL 868692,

at *3 (D. Del. Mar. 14, 2012).

## V.  ARGUMENT

**A.** **The Court Lacks Subject Matter Jurisdiction.**

Plaintiffs' claims for monetary, injunctive, and/or declaratory relief must be dismissed for

lack of subject matter jurisdiction because Plaintiffs lack constitutional standing to sue.

Plaintiffs allege that they seek to recover "losses suffered by the Plan, and other relief"—

including a declaratory judgment and injunctive relief—"caused by Wilmington Trust when it

authorized the Plan to buy shares of ISCO in 2012 for more than fair market value."  Compl. ¶ 3.

As discussed below, Plaintiffs have not suffered the requisite injury in fact and otherwise have

failed to allege the real and immediate threat of future harm required to seek injunctive or declaratory relief.

### 1.     Article III Requirements

In order to maintain a claim under ERISA, a plan participant "must not only satisfy standing under [ERISA], but must also meet the standing requirements of Article III." *Perelman v. Perelman*, 919 F.Supp.2d 512, 517 (E.D. Pa.), *aff'd* 793 F.3d 368 (3d Cir. 2015); *see Loren v. Blue Cross Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007) ("Merely because Plaintiffs claim that they are suing on behalf of their respective ERISA plans does not change the fact that they must also establish individual standing."); *In re Wilmington Trust Corp. ERISA Litig.*, 943 F. Supp. 2d 478, 488 (D. Del. 2013) (dismissing plaintiff from stock drop suit for lack of standing where she was a "net-seller" who did not suffer actual injury).

Article III of the U.S. Constitution requires that plaintiffs seeking either monetary or other equitable relief demonstrate that they have suffered an "injury in fact" that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016); *Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Gonzales*, 211 Fed.Appx. 91, 95 (3d Cir. 2006) ("[T]he plaintiff must show that he [or she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.") (quoting *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188-89 (3d Cir. 2006)). Importantly, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S.Ct. at 1549.

**2.      Plaintiffs Have Not Suffered an Injury to Their Personal Legal Interests.**

Plaintiffs' failure to allege any concrete, individualized harm is a fatal flaw and the Court

should dismiss their claims for lack of constitutional standing.  Plaintiffs' Complaint focuses on

alleged injuries to the ESOP generally and the purported class of ESOP participants.  *See* Compl.

¶¶ 4, 8, 31, 47.  Their sole allegation of personal injury—that they "suffered a diminution in the

value of their Plan accounts" and "continue to suffer such losses in the present," Compl. ¶ 62—is

demonstrably false.  From the time Plaintiffs first acquired ISCO shares on December 31, 2012,

the value of those shares has increased from $9.75 per share as of December 31, 2012, to $15.90

per share as of December 31, 2013, to $18.20 per share as of December 31, 2014, to $21.10 per

share as of December 31, 2015.[1]  Kirchdorfer Decl., Ex. C, Fiorito Account Statements;

Kirchdorfer Decl., Ex. D, Swain Account Statements; *cf. In re Wilmington Trust Corp. ERISA*

*Litig.*, 943 F.Supp.2d at 488 ("[P]laintiffs must allege more than a 'price drop throughout a

proposed class period to articulate an injury to create standing.'") (quoting *Brown v. Medtronic*,

628 F.3d 451, 456 (8th Cir. 2010) (concluding that plaintiff lacked constitutional standing

because the price had not decreased by the time he sold his shares)).

Because the value of Plaintiffs' allocated shares have not suffered a diminution in value,

Plaintiffs seek to shift the Court's attention to the fact that, after the Transaction, the shares that

the ESOP purchased for $98 million were shown in the ESOP public filings with the Department

as having a value of $39 million.  *See* Compl. ¶¶ 44-47.  In essence, Plaintiffs claim that they

were harmed because the value of ISCO stock may have been higher before the ESOP

Transaction (when Plaintiffs did not own it) than it was immediately after the Transaction closed

---

[1] The 2016 annual valuation has not yet been completed.

(which was still before any shares were allocated to their accounts under the ESOP).[2]  *Id.*  Any such argument is unavailing, however, because as Plaintiffs themselves recognize, *see* Compl. ¶ 23, the Transaction was a leveraged transaction, with the debt associated with the Transaction reducing the net equity value of the ISCO shares following the Transaction.

The ESOP is akin to a buyer who obtains financing to purchase a house.  Assume the buyer decides to purchase the house for $100,000, and the house is valued at $100,000 as of the date of purchase.  If the buyer pays $20,000 in cash and takes out an $80,000 mortgage to finance the remainder of the purchase price, the buyer's net equity in the house is $20,000.  But the way the buyer has structured the purchase price does not impact the value of the house, which remains $100,000 post-sale.[3]  It is absurd to suggest that the buyer overpaid for the house because, due to the debt financing, his or her net equity value was $20,000—as opposed to $100,000—after the purchase.

Similar logic applies when an ESOP purchases a company's stock using debt financing.[4]  Plaintiffs allege that the shares that the ESOP acquired on December 20, 2012 had a value of $39

---

[2] Under IRS guidance, where company stock is acquired with proceeds from an ESOP loan, the shares of stock "are placed in a suspense account to be allocated to participants accounts as the loan is paid off by employer contributions." I.R.S. IRM § 4.72.4.3.6, 2006 WL 5223497 (Apr. 1, 2006).

[3] The amount of the seller's equity in the house likewise has no impact on its value.  There is, of course, nothing unfair about the fact that the seller had $100,000 of equity in the house before the transaction while the buyer had $20,000 after the transaction.

[4] Notably, the Department withdrew its complaint in *Dole v. Farnum*, Civil Action No. 90-0371 (D.R.I. July 30, 1990), a case where it had taken the same position Plaintiffs appear to take here; namely, that ESOP-related debt negatively affects the subject company stock's post-transaction value.  In remarks to the Senate, Senator Robert Byrd of West Virginia "congratulate[d] the Department" on its decision to withdraw the *Farnum* complaint.  *See* 136 Cong. Rec. S17793, 1990 WL 168765 (October 27, 1990) (Statement of Sen. Byrd).  The senator recognized that the Department's position in *Farnum* was "contrary to congressional intent towards leveraged ESOP's."  *Id.*  He explained, "[t]he price, or market value" in a leveraged ESOP transaction "is

million immediately following the Transaction.  Compl. ¶ 44.  The difference between the $98

million transaction price and the $39 million is fully explained by the debt financing that

Plaintiffs, in other parts of the Complaint, admit was associated with the Transaction.  Compl. ¶¶

7, 23.  Plaintiffs' reliance on the Company's net *equity* value immediately post-Transaction as an

indication that the Transaction was for more than fair market value fails to account for the debt

financing that is a necessary part of virtually every ESOP transaction.

Upon the closing of the Transaction, the only thing ESOP participants were entitled to

under the terms of the ESOP were potential future allocations of shares of ISCO, as encumbered

by debt.  Plaintiffs contributed nothing in connection with the ESOP's purchase of ISCO stock,

nor did they incur any personal obligation to repay the debt that allowed the ESOP to obtain

those shares.  They have suffered no injury whatsoever, let alone a concrete and particularized

one.

Plaintiffs mischaracterize SRR's December 31, 2012 valuation when they refer to it as a

post-Transaction "re-valu[ing]."  Compl. ¶ 44.  In doing so, they give the false impression that

the December 31 equity value of $39,000,000 was the actual equity value at the time of the

December 20 Transaction. That is false:  while ISCO's debt load accounted for a drop in its

*equity value* as of December 31, its *enterprise value* (i.e. the entire economic value of the

company) did not materially change in the twelve days following the Transaction.  *See* Exhibit 1,

Jeffrey M. Risius, BUSINESS VALUATION: A PRIMER FOR THE LEGAL PROFESSION 26 (2007) ("To

convert a [business enterprise value] to an equity value, interest-bearing debt is simply subtracted

from the [business enterprise value].").

---

what a willing buyer will pay to a willing seller, and it does not matter whether the buyer uses
cash on hand, or debt."  *See id.*

Furthermore, any difference between the Company's equity value pre- and post-Transaction did not harm Plaintiffs.  In fact, it did not impact them at all because they did not hold any shares of ISCO stock in their ESOP account until after the Transaction.  On the Transaction date—December 20, 2012—the ESOP was formed, and the newly-formed ESOP purchased Company stock and entered into the loan that financed its purchase.  *See* Kirchdorfer Decl., Ex. A, Plan Document at § 1.1(b); Kirchdorfer Decl., Ex. B, ESOP Loan Agreement at 1.  In accordance with the ESOP's terms, shares were not allocated to Plaintiffs' ESOP accounts until eleven days later, on December 31, 2012.  *See* Kirchdorfer Decl., Ex. A, Plan Document § 4.6(a); Kirchdorfer Decl., Ex. C, Fiorito Account Statements; Kirchdorfer Decl., Ex. D, Swain Account Statements.  In short, because Plaintiffs did not hold any Company stock in their ESOP account on the Transaction date, they cannot establish an individualized injury to their ESOP account that occurred immediately upon the closing of the Transaction.  For all these reasons, Plaintiffs lack standing to seek monetary relief.

### 3.    Plaintiffs Have Not Alleged a Real and Immediate Threat of Future Injury.

Plaintiffs also lack standing to seek injunctive or declaratory relief because they do not—and cannot—allege that they face a real and immediate threat of future harm.  Their allegations describe only *past actions* by Wilmington Trust that allegedly constitute prohibited transactions in violation of ERISA section 406.  Compl. ¶¶ 48-58.

Plaintiffs ask the Court to "[e]njoin Defendant Wilmington Trust from *further* violations of ERISA and its responsibilities, obligations, and duties," and to "[d]eclare that Defendant Wilmington Trust *caused* the Plan to engage in prohibited transactions."  Compl. p. 12 (emphasis added).  To have standing to seek such relief, however, a plaintiff must "demonstrate actual present harm or the significant possibility of future harm."  *Werner v. Primax Recoveries, Inc.*, 365 Fed. App'x 664, 668 (6th Cir. 2010) (citations omitted).  "Even if the plaintiff has suffered a

13

previous injury due to the defendant's conduct, the equitable remedy of an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Plaintiffs do not point to any real or immediate future threat or significant possibility of future harm. Rather, their allegations focus on past actions related to the Transaction that took place in December 2012. *See* Compl. ¶¶ 48-58; *see ZF Meritor*, 696 F.3d at 301 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.")). Plaintiffs' passing allegation that "they continue to suffer such losses in the present," Compl. ¶ 62, is devoid of any supporting factual allegations and is far too conclusory to satisfy their burden of clearly demonstrating a threat of future injury. *See Spokeo,* 136 S. Ct. at 1547 ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of constitutional standing) (citations omitted); *Mosby v. Ligon*, 418 F.3d 927, 933 (8th Cir. 2005) (concluding that complaint failed to establish standing for prospective relief because it "it dwells almost exclusively on [plaintiff's] past interactions with [defendant]"). Consequently, Plaintiffs' claims should be dismissed for lack of standing, with prejudice.[5]

---

[5]   Plaintiffs' lack of a legal interest in the claims they assert is underscored by their severance agreements in which they each agreed not to sue ISCO's shareholders, which would include Wilmington Trust as the ESOP trustee, and separately agreed to a release of claims against Wilmington Trust, among others. Kirchdorfer Decl., Ex. E, Swain Release; Kirchdorfer Decl., Ex. F, Fiorito Release. Wilmington Trust does not seek dismissal of the Complaint based on the covenant not to sue or the release. Rather, it alerts the Court to these provisions so that it has an

**B.      Plaintiffs' Have Failed to State a Plausible Prohibited Transaction Violation.[6]**

Even if the Court were to conclude that it has subject matter jurisdiction, Plaintiffs'

Complaint should be dismissed under Rule 12(b)(6) for failing to state a claim upon which relief

can be granted.  Plaintiffs' Complaint merely couples a recitation of the elements of ERISA's

prohibited transaction rules with a handful of conclusory statements regarding the Transaction.

In doing so, the Complaint fails to satisfy the pleading requirements that the Supreme Court

established in *Iqbal* and *Twombly*.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice.") (citing *Twombly*, 550 U.S. at 555).  Below is an examination of each of the five

prohibited transactions theories Plaintiffs baldly allege in the Complaint.

Plaintiffs assert that Wilmington Trust violated ERISA § 406(a)(1)(E), which Plaintiffs

say "prohibits Wilmington Trust from causing the Plan to acquire ISCO securities."  Compl.

¶ 49.  Not only do Plaintiffs completely mischaracterize the statute, they fail to recognize that the

provision is wholly inapplicable to ESOPs.  ERISA § 406(a)(1)(E) provides that a plan fiduciary

> shall not cause the plan to engage in a transaction, if he knows or
> should know that such transaction constitutes a direct or
> indirect . . . acquisition, on behalf of the plan, of any employer
> security or employer real property *in violation of [ERISA §
> 407(a)]*.

29 U.S.C. § 1106(a)(1)(E) (emphasis added).  While focusing on ERISA § 407(a), Plaintiffs

understanding of the additional hurdles Plaintiffs would face in the event the Court were to find
constitutional standing.

[6]   In their Complaint, Plaintiffs describe, cite, and/or otherwise reference the ESOP, the stock
purchase agreement and attendant loan agreement for the ESOP's purchase of ISCO's stock, and
the Plaintiffs' individual ESOP accounts.  Plaintiffs did not, however, file or attach these
documents to their Complaint.  But, having incorporated these documents into their Complaint
by reference, they are nevertheless properly considered as a part of the pleading or record in a
motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Solomon v. Ave. Const. LLC*, 2012 WL
23339260, at *1 (D. Del. June 19, 2012) ("[W]hen ruling on a 12(b)(6) motion, the Court may
consider . . . documents incorporated into the Complaint by reference.") (citation omitted).

completely ignore that the next statutory subsection, ERISA § 407(b), exempts individual account plans—like the ESOP—from the application of section 407(a).  ERISA § 407(b)(1), 29 U.S.C. §1107(b)(1) ("Subsection (a) of this section shall not apply to any acquisition or holding of qualifying employer securities . . . by an eligible individual account plan.").  Because ERISA § 407(a) does not apply to the ESOP, Plaintiffs cannot maintain a prohibited transaction claim under ERISA § 406(a)(1)(E) premised on a violation of ERISA § 407(a).

Plaintiffs next assert two additional violations of ERISA § 406(a), which provides that

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or] (B) lending of money or other extension of credit between the plan and a party in interest[.]

29 U.S.C. § 1106(a)(1)(A), (B).

In support of their claims for violations of ERISA § 406(a)(1)(A) and (B), Plaintiffs' Complaint fails to identify the particular "party in interest" with whom the ESOP transacted. ERISA § 3(14)(A)-(I), 29 U.S.C. § 1002(14)(A)-(I), lists nine categories of parties in interest, plus subcategories.  Plaintiffs seek to cover the waterfront by broadly asserting that the party in interest with whom the ESOP engaged is "ISCO (the Plan's sponsor and administrator, whose employees participate in the Plan) or other party in interest sellers."  Compl. ¶ 49.  The Complaint, however, fails to identify on which one of the statutory bases any person or entity is purported to be a party in interest, let alone any factual allegations in support of their theory.  In short, they fail to provide specificity on even the most basic of facts necessary to plead a prohibited transaction claim—the specific identity of the other transacting party.[7]

---

[7] With respect to Plaintiffs' claims under ERISA § 406(a), some courts in this Circuit have held that plaintiffs are required to establish that ERISA § 408's exemptions to the prohibited transaction rules do not apply, while other courts have observed that the exemptions are more

16

Plaintiffs also assert that Wilmington Trust violated ERISA§ 406(b)(2), which provides that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." Compl. ¶ 52; 29 U.S.C. § 1106(b)(2). Plaintiffs baldly allege that Wilmington Trust "acted on behalf of Seller in connection with the Plan's stock and loan transactions in 2012 with Seller by causing the Plan to acquire ISCO stock and a loan." Compl. ¶ 53. Plaintiffs plead no facts that support even an inference that Wilmington Trust "acted on behalf of Seller." Indeed, the few facts Plaintiffs do plead, taken as true, establish that Wilmington Trust represented and acted on behalf of the ESOP only. *See* Compl. ¶ 3 (Wilmington Trust "authorized the Plan to buy shares of ISCO"); *id.* ¶ 6 ("Wilmington Trust represented the Plan . . . in the ESOP Transaction."); *id.* ¶ 15 ("Wilmington Trust had exclusive authority to manage and control the assets of the Plan and . . . to authorize the ESOP Transaction."); *id.* ¶ 30 ("Wilmington Trust, in its capacity as Trustee of the Plan, caused the Plan to purchase all 4,000,000 outstanding and issued shares of ISCO common stock from Seller."); *id.* ¶ 31 ("Wilmington Trust caused the Plan to issue a note payable to ISCO."). As the Complaint does not contain a single factual allegation suggesting that Wilmington Trust acted on behalf of anyone other than the ESOP, the Complaint fails to state a claim for a violation of

---

like affirmative defenses that cannot be decided on a motion to dismiss. *Compare Goldenberg v. Indel, Inc.*, 741 F.Supp.2d 618, 631-32 (D.N.J. 2010) (holding that section 408 exemptions are affirmative defenses) *with Mehling v. New York Life Ins. Co.*, 163 F.Supp.2d 502 (E.D.Pa. 2001) (dismissing plaintiffs' claims for failure to plead exemption). It bears repeating that ERISA § 408(e) provides an exemption whereby a plan may purchase employer securities so long as it does so for no more than "adequate consideration," 29 U.S.C. § 1108(e), which ERISA defines as "fair market value," ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B). While Plaintiffs have made conclusory allegations that the ESOP purchased the ISCO stock at greater than fair market value, the only basis for their conclusion is that the net equity value was lower after the Transaction due to the debt financing. For the reasons explained in Part V.A.2, *supra*, this fact does not indicate that the purchase price was too high or that Plaintiffs or the ESOP were harmed.

ERISA § 406(b)(2).

Finally, Plaintiffs maintain that Wilmington Trust violated ERISA § 406(b)(3), Compl. ¶ 54. which provides that a plan fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Plaintiffs plead one conclusory allegation in support of this claim: "Wilmington Trust received compensation from ISCO as Trustee for the Plan in violation of ERISA § 406(b)(3)." Compl. ¶ 54. Yet they plead no supporting facts to bear out their claim. To state a claim for violation of this subsection requires Plaintiffs to allege facts sufficient to show that Wilmington Trust (1) received consideration; (2) from a party dealing with the ESOP; (3) in connection with the ESOP Transaction. Literally nothing in the Complaint indicates how much consideration Wilmington Trust received, that it received compensation in connection with the ESOP Transaction—*or even that it received any compensation at all.*[8] At most, the Complaint indicates that ISCO appointed Wilmington Trust (though that does not necessarily mean ISCO paid Wilmington Trust). *Id.*

Accordingly, Plaintiffs' Complaint contains only bare allegations and conclusory statements, devoid of facts, that the Supreme Court has observed fail the notice pleading standards under the Federal Rules. *See Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 8(a). The Complaint, therefore, should be dismissed.

---

[8] The absence of any hint in the Complaint that Wilmington Trust was overpaid for its services does not bode well for Plaintiffs' ultimate success on this claim. Quite understandably, ERISA section 408(b)(2) permits parties in interest (indeed, all service providers to ERISA plans are parties in interest) to be paid so long as they receive "no more than reasonable compensation." 29 U.S.C. § 1108(b)(2). There is no basis alleged for concluding that Wilmington Trust received more than reasonable compensation for its services in connection with the ESOP Transaction.

# VI.   <u>CONCLUSION</u>

For the foregoing reasons, Wilmington Trust respectfully requests that the Court dismiss the Complaint with prejudice.


Dated: April 3, 2017

Respectfully submitted:

MORRIS JAMES LLP

<u>   /s/ Albert H. Manwaring, IV            </u>
P. Clarkson Collins (#739)
Albert H. Manwaring, IV (#4339)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 888-6800
pcollins@morrisjames.com
amanwaring@morrisjames.com

OF COUNSEL:

GROOM LAW GROUP, CHARTERED

Michael J. Prame (*pro hac vice*)
Lars C. Golumbic (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
Andrew D. Salek-Raham (*pro hac vice*)
1701 Pennsylvania Ave., N.W., Suite 1200
Washington, D.C. 20006
Telephone:  (202) 857-0620
mprame@groom.com
lgolumbic@groom.com
nfedder@groom.com
asalek-raham@groom.com

*Attorneys for Defendant*
*Wilmington Trust, N.A.*

# EXHIBIT 1

# Business Valuation

## A PRIMER FOR THE LEGAL PROFESSIONAL

Jeffrey M. Risius

Law
up
416

7





Defending Liberty
Pursuing Justice

# Business Valuation

## A PRIMER FOR THE LEGAL PROFESSIONAL

Jeffrey M. Risius





The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Section of Business Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

© 2007 by the American Bar Association. All rights reserved.

No part of the publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Permission requests should be sent to the American Bar Association Copyrights & Contracts Department via e-mail at copyright@abanet.org or via fax at (312) 988-6030.

Printed in the United States of America.

ISBN 10: 1-59031-746-7
ISBN 13: 978-1-59031-746-4

Library of Congress Cataloging-in-Publication Data

Risius, Jeffrey M.
  Business valuation : a primer for the legal profession / Jeffrey M. Risius.
    p. cm.
  Includes index.
  ISBN 978-1-59031-746-4 (pbk.)
  1. Business enterprises—Valuation—Law and legislation—United States. 2. Corporations—Valuation—United States. I. Title.

  KF1416.R57 2007
  346.73'065—dc22
                                    2007015772

Discounts are available for books ordered in bulk. Special consideration is given to state and local bars, CLE programs, and other bar-related organizations. Inquire at ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60610.

For a complete list of ABA Publications, visit www.ababooks.org

10  09  08  07    5  4  3  2  1

24   **Business Valuation**

| | | | |
|---|---|---|---|
| **Illustration 4.1** *ABC Company at Book Value* | | | |
| **ASSETS** | | **LIABILITIES AND EQUITY** | |
| *Current Assets* | | *Current Liabilities* | |
| Cash | $ 50 | Accounts Payable | $150 |
| Accounts Receivable | 250 | Accrued Expenses | 190 |
| Inventory | 200 | | |
| | 500 | | 340 |
| | | *Long-Term Liabilities* | |
| *Net Fixed Assets* | 300 | Interest-Bearing Debt | 400 |
| | | *Shareholders' Equity* | 60 |
| *Total Assets* | $800 | | $800 |

The book value of a company reflected on its balance sheet may also understate market value because certain intangible assets of the company may not be reflected on the balance sheet at all. For example, a company that regularly invests dollars in research and development typically will have developed significant technology or perhaps some patents, but these assets generally do not appear on the balance sheet. Or a company could have invested heavily in advertising and promotions over the last 50 years, thus developing a well-known trade name or trademark that has significant value in the form of dominant market share or price premiums. Again, these assets would not appear on a balance sheet even though they are potentially very valuable. A company's internally generated intellectual property and other intangible assets do not appear on the balance sheet, thus causing book value to significantly understate market value.

However, it is possible for an intangible asset to appear on a company's balance sheet that is prepared in accordance with GAAP. When one company acquires another, accounting principles require an allocation of the purchase price to all of the assets it acquired at fair value (i.e., a form of market value), including certain intangible assets. However, just like the earlier example with land, the value reflected on the balance sheet will still be stated at its historical cost.

Book values can also overstate market value if the company has liabilities that are not listed on the balance sheet. A common example of this would include environmental liabilities.

Now that we have established what market value is not, we need to understand: (1) how to translate book value to market value; and (2) how to interpret what market value really represents. The first step in this process is to understand the concept of Business Enterprise Value.

# What Does the Term *Business Enterprise Value* Represent?

The Business Enterprise Value ("BEV") of a company can be thought of in a couple of different ways. As shown in Illustration 4.2, the BEV of a company

**Illustration 4.2**
**Business Enterprise Value of ABC Company**
*ABC Company at Market Value*

| ASSETS | | LIABILITIES AND EQUITY | |
|---|---|---|---|
| *Current Assets* | | *Current Liabilities* | |
| Cash | $ 50 | Accounts Payable | $150 |
| Accounts Receivable | 250 | Accrued Expenses | 190 |
| Inventory | 200 | | |
| | 500 | | 340 |
| | | *Long-Term Liabilities* | |
| *Net Fixed Assets* | 315 | Interest-Bearing Debt | 400 |
| *Intangible* | 25 | *Shareholders' Equity* | 100 |
| *Total Assets* | $840 | | $840 |

**Illustration 4.3**
**Business Enterprise Value of ABC Company**



Intangible Assets $25

Net Working Capital $160

Fixed Assets $315

can be viewed as the market value (as opposed to book value) of all of the assets of a company less the company's operating liabilities. The assets of a company typically include items such as cash, accounts receivable, inventory, fixed assets, and intangible assets such as patents, trade names, customer lists, assembled work force, and goodwill. The term "operating liabilities" includes items such as accounts payable, accrued expenses, and other liabilities of the company incurred in its day-to-day business operations. Operating liabilities exclude all of the company's interest-bearing debt, which is more appropriately thought of as a financing type liability as opposed to an operating liability.

The BEV of ABC Company in Illustrations 4.2 and 4.3 is $500. Said another way, the BEV of ABC Company is comprised of the following assets: $160 of net working capital, $315 of fixed assets, and $25 of intangible assets. Net working capital in this context is comprised of the company's current assets, which are short-term type assets that are utilized in the business, less current liabilities, which are liabilities incurred in the operations of the business that are payable in less than a year.

A second way to think about the BEV of a company is to consider the other side of the balance sheet. As shown in the shaded area of Illustration 4.4, the BEV of $500 is equal to the value of interest-bearing debt plus equity capital.

**Illustration 4.4**
*ABC Company at Market Value*

| ASSETS | | LIABILITIES AND EQUITY | |
|---|---|---|---|
| *Current Assets* | | *Current Liabilities* | |
| Cash | $ 50 | Accounts Payable | $150 |
| Accounts Receivable | 250 | Accrued Expenses | 190 |
| Inventory | 200 | | |
| | 500 | | 340 |
| | | *Long-Term Liabilities* | |
| *Net Fixed Assets* | 315 | Interest-Bearing Debt | 400 |
| *Intangible Assets* | 25 | *Shareholders' Equity* | 100 |
| Total Assets | $840 | | $840 |

**Illustration 4.5**
**Business Enterprise Value of ABC Company**

Debt - $400



Equity - $100

The importance of understanding what BEV represents becomes clear when you consider how to interpret a headline in the newspaper that reads: "Hoosier, Inc. is sold to ABC Company for $100 Million!"

What does that headline mean? Does the amount simply represent the value paid for the equity (i.e., the stock) of the target company, or does this amount include the value of not only the stock but interest-bearing debt assumed by the buyer in the deal as well?

In most situations involving attorneys where there is a valuation issue, whether it be related to a shareholder dispute, a divorce, estate planning, a buy-sell agreement formulation, or advising on a transaction, to name a few, the typical issue ultimately at hand is the value of equity capital. To convert a BEV to an equity value, interest-bearing debt is simply subtracted from the BEV. As shown in Illustration 4.5, the value of ABC Company's equity is $100.

While the book value of ABC Company's equity is $60 (Illustration 4.1), the market value is $100 (Illustrations 4.2 and 4.5). The next thing to consider is the financial basis that causes market participants to place value on a business that is greater than the amounts reflected on the balance sheet.